| | |
|---|---|
| HEIDI JOHNSTON, | Case No. 08-CV-0296 (PJS/RLE) |
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER |
| U.S. BANK NATIONAL ASSOCIATION, | |
| Defendant. | |

Christopher D. Jozwiak and Clayton D. Halunen, HALUNEN & ASSOCIATES, for plaintiff.

Jodie F. Friedman and Kathryn Mrkonich Wilson, LITTLER MENDELSON, PC, for defendant.

Plaintiff Heidi Johnston worked as a credit analyst at defendant U.S. Bank National Association ("U.S. Bank") for about two and a half years. She took six weeks of maternity leave in early 2006 and then returned to work on a flexible full-time schedule. In September 2006, about two weeks after her supervisor criticized her for making too many errors, Johnston was fired. Johnston contends that U.S. Bank discriminated against her based on both her sex and her status as a parent in violation of the Minnesota Human Rights Act ("MHRA").[1] U.S. Bank

---

[1] Johnston also brought a claim for retaliation under the Family and Medical Leave Act ("FMLA"), but Johnston agreed to drop that claim. Pl. Mem. Opp. Def. Mot. S.J. at 1 n.1 [Docket No. 33].

It is unclear whether Johnston also intends to drop her claim for retaliation under the MHRA as alleged in Count I of her amended complaint. Johnston has not made any argument to support such a claim, and the record does not support it. Johnston never complained to U.S. Bank of discrimination, and thus U.S. Bank cannot have retaliated against her for opposing discrimination. *See Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002) (holding that plaintiff's retaliation claim under Title VII failed where plaintiff provided no evidence that she opposed an employment practice made unlawful by Title VII). The Court therefore grants

(continued...)

moves for summary judgment. For the reasons that follow, the Court grants in part and denies in part U.S. Bank's motion.

## I. BACKGROUND[2]

Johnston began working as a credit analyst for U.S. Bank in May 2004. Johnston Dep. at 105. A credit analyst performs an initial analysis of a commercial credit application. With respect to each application, a credit analyst produces a report known as a "review." The review analyzes the applicant's financial statements, discusses facts relevant to the riskiness of granting the requested credit, and assigns a numerical risk rating to the application. A supervisor then looks at the initial review to determine whether to grant the requested credit. Johnston Dep. at 114.[3]

Johnston was initially hired to work in the "business card" department within the "specialized underwriting" division of U.S. Bank.[4] Johnston Dep. at 105. The specialized-

---

[1](...continued)
summary judgment to U.S. Bank with respect to retaliation.

Johnston also nominally brings a claim for pregnancy discrimination in Count I of her amended complaint. But again, she has not made any argument to support such a claim, and the record does not support it. The Court finds no possible basis for a pregnancy-discrimination claim on this record, given that U.S. Bank fired Johnston some eight months after she gave birth. The Court therefore grants summary judgment to U.S. Bank with respect to pregnancy discrimination.

[2]Because U.S. Bank moves for summary judgment, the Court recounts the facts in the light most favorable to Johnston (to the extent that admissible evidence supports Johnston's version of the facts).

[3]All deposition citations are to the transcripts attached to the Jozwiak affidavit [Docket No. 34].

[4]The specialized-underwriting division was previously known as the "corporate card credit" division. Lobejko Dep. at 44.

underwriting division included two departments besides the business-card department: "portfolio management" and "credit initiation." The portfolio-management department generally handled complex applications for large amounts of credit from existing U.S. Bank customers. Foust Dep. at 38. The business-card department likewise handled applications for credit from customers that, for the most part, were already U.S. Bank customers, but the applications were simpler and were for smaller amounts of credit than the applications handled by portfolio management. Johnston Dep. at 108-10; Foust Dep. at 37-38. The credit-initiation department, unlike the other two departments, generally handled credit applications from customers without an existing relationship with U.S. Bank. Johnston Dep. at 111-13; Foust Dep. at 37-38. Thus, reviewing applications in the credit-initiation department required more research, and better analytical skills, than reviewing applications in the business-card department. Johnston Dep. at 113-14; Paper Dep. at 33-34.

In general, each of the three departments within the specialized-underwriting division had one manager, and those three managers reported to the head of the division. It appears that when Johnston was hired in 2004, Ben Levich managed the business-card department, Richard Craine managed the credit-initiation department, and Andy Dunaway managed the portfolio-management department. Johnston Dep. at 110; Lobejko Dep. at 31, 40; Foust Dep. at 17. They all reported to Paulette Kowalewski, the head of the specialized-underwriting division.[5] Anderson Dep. at 109-10.

---

[5]Kowalewski apparently replaced Michael Conrad. Lobejko Dep. at 36. Although Conrad is mentioned occasionally in some depositions, he never supervised Johnston. *Id.* at 41.

Throughout 2005 and 2006, there was substantial shuffling among managers and credit analysts within the specialized-underwriting division, and it appears that the business-card department may have been dissolved. Most significantly for this case, in early 2005, Marc Paper replaced Craine as the manager of the credit-initiation department. Lobejko Dep. at 22. And in July 2005, Greg Foust replaced Kowalewski as the head of the specialized-underwriting division. Anderson Dep. at 14, 110. Foust and Paper remained in these positions through September 2006, when Johnston was fired on Foust's and Paper's say-so.

In April 2005, Johnston moved from the business-card department to the credit-initiation department, where she reported to Paper, who selected her for the position. Johnston Dep. at 110. At the time, her fellow analysts in the credit-initiation department were Linda Anderson and Barb Johnson. Johnston replaced Ann Lobejko, who transferred to portfolio management at about the time that Paper became the manager of credit initiation. Lobejko Dep. at 23-25. Anderson also transferred to portfolio management sometime in late 2005, after a confrontation with Paper. Anderson Dep. at 20, 22, 26-27. Also at about that time, Drew Beckman transferred to credit initiation from the business-card department. Paper Dep. at 152. Johnston's fellow analysts in credit initiation thus included Anderson (for part of 2005), Johnson (for the entire period Johnston worked at U.S. Bank), and Beckman (from late 2005 or early 2006 until Johnston was fired). Anderson Dep. at 20; Johnston Dep. at 115.

Three other credit analysts worked in credit initiation after, or perhaps shortly before, Johnston was fired. Tony Wolfe may have been hired in the summer of 2006. Foust Dep. at 138. Caroline Zhang was hired at some point to replace Anderson and was later fired. Lobejko Dep.

at 264-67. And Steve Van Gheem was hired to replace Johnston in roughly April 2007. Foust Dep. at 136; Paper Dep. at 152-53.

As noted, Lobejko and Anderson moved from credit initiation to portfolio management some time in 2005. They joined two other analysts in portfolio management, Karen Fennacy and Susan Imhoff. Fennacy Dep. at 13; Anderson Dep. at 57. Portfolio management was managed by Andy Dunaway for a period of time and then by Andy Ryall. Anderson Dep. at 22, 54. In November 2006 — two months after Johnston was fired — Paper replaced Ryall as manager of portfolio management. Lobejko Dep. at 77-78. At the same time, Paper was given a new management role underneath Foust: Paper became the supervisor of Brian Richter, who had replaced Paper as manager of credit initiation. *Id.* at 78. In other words, whereas Paper, as manager of credit initiation, had reported directly to Foust, Richter instead reported to Paper, who in turn reported to Foust. Paper Dep. at 7.

According to Fennacy, Paper was arrogant toward everyone. Fennacy Dep. at 20, 51. Anderson testified that Paper threw temper tantrums. Anderson Dep. at 36-37. Anderson also testified that Paper made negative comments about her age. *Id.* at 25-26, 92. Lobejko said that Paper yelled and threw things and expressed frustration, but she could not say that he expressed his frustration in a discriminatory way based on sex. Lobejko Dep. at 307-08, 319-320. Foust, as Paper's supervisor, counseled Paper about how to express frustration and about Paper's overly direct communication style. Foust Dep. at 141-42.

When Paper managed the credit-initiation department, he would go over every review prepared by the analysts in the department. Johnston Dep. at 114; Paper Dep. at 48. Paper generally did not approve a review in its initial form. Rather, from seventy to ninety percent of

the time, Paper would write comments on the review and return it to the analyst for correction or further clarification. Paper Dep. at 72; Fennacy Dep. at 23. Some comments related to presentation (particularly writing style), while others were substantive and identified issues that the analyst had not addressed or had addressed in a way that did not match up with bank policy. Paper Dep. at 66-72. Paper sometimes sat down with the analyst to go over a particular review and discuss the changes he was requesting. *Id.* at 77-82. Such one-on-one conversations — termed "coaching" by U.S. Bank personnel — were the primary means of training analysts in Paper's department. Beckman Dep. at 11-12. Johnston received ongoing, informal coaching from Paper roughly every week. Johnston Dep. at 118.

The standards for reviews occasionally changed, and such changes were generally communicated to analysts through comments on particular reviews, by email, or in meetings. *Id.* at 41. Throughout 2005, the standards changed often, and Paper would meet with the analysts about every two weeks to go over the changes. Paper Dep. at 12-15.

Johnston became pregnant in the summer of 2005. Johnston Dep. at 120. Some time in September 2005, Johnston requested that, after she returned from maternity leave, she be permitted to work a flexible schedule. *Id.* at 132-34. Specifically, Johnston asked to work from 6:00 a.m. to 3:00 p.m. each day. *Id.* at 145. Paper and Foust approved the request. *Id.* at 133.

Sometime in early 2006, Paper filled out a performance-appraisal form assessing Johnston's performance for 2005. Jozwiak Aff. Ex. 3. Paper gave Johnston a rating of "solid performance" (number 3 on a scale from 1 to 5) in all categories. *Id.* Foust agreed that Johnston's performance in 2005 was solid. Foust Dep. at 84. Paper did, however, comment in

the appraisal form that "[a]t times her writing is too brief with not enough explanation . . . ."

Jozwiak Aff. Ex.3 at USBJ 141.[6]  In the "performance summary," Paper wrote:

> In 2006, the goal will be to have [Johnston] work on larger, more difficult deals.  She has primarily been working on lower risk, lower dollar relationships thus far and during this time, the quality of her work has improved significantly since her being moved from business card.

Id. at USBJ 142.  In a section setting goals for the upcoming year, Paper wrote:

> Learn to tell the 'story' of the financials as opposed to transcribing financial information.  [Johnston] has demonstrated an ability to identify key financial ratios; however, in the upcoming year we will work together to try to improve upon her underwriting 'writing' skills so that each credit is its own rather than looking like a template.

Id. at USBJ 143.  And in the concluding comments section, Paper wrote:

> [Johnston's] overall performance for the year met my expectations.  I knew that coming over from Business Card . . . there would be some challenges, especially in the quality and quantity of the work required on the corporate card side.  However, I feel that she is well on her way to succeeding.  She has shown a desire to learn and grow as an analyst and has a relaxed demeanor which at this time I am not certain if it will work for or against her.  While the amount of work does not appear to bother her, at times, it seems as though she doesn't seem confident in the work she is submitting and is hesitant with questions that are asked of her work.  This is something we can work on together as, in [credit] initiation, there is substantial pressure from sales to either get credits approved or respond to why they were declined.  As [Johnston] becomes more comfortable with her credit skills, I think this is an area she will need to, and can improve on.

Id.  Johnston discussed the performance appraisal with Paper and thought that it was fair.

Johnston Dep. at 149-54.

---

[6]Many of the exhibits in this case bear Bates numbers with the prefix "US Bank/Johnston," which the Court abbreviates "USBJ."

Johnston went on maternity leave in late January 2006 and had her baby at about that time. *Id.* at 143. She took roughly six weeks off (out of a possible twelve) and returned to work on March 6, 2006. *Id.* at 144. Sometime after returning to work, Johnston asked Paper for permission to work at home two days a week and to work at the office from 6:00 a.m. to 3:00 p.m. the other three days. *Id.* at 145-46; Paper Dep. at 52-53. Paper approved the request, though he told Johnston that the new schedule might need to be changed if it became a problem. Johnston Dep. at 146.

When Johnston first returned from leave, Paper assigned her higher-value credit applications to review, as anticipated in her performance review for 2005. *Id.* at 150. But by May 2006, Johnston noticed that the applications assigned to her were getting less complicated. *Id.* at 37. Also at about this time, Johnston noticed that Paper was more condescending to her, and less patient with her, than he had been in the past. *Id.* at 28. Lobejko noticed tension between Johnston and Paper when Johnston returned from leave. Lobejko Dep. at 82.[7] Beckman testified that Paper treated Johnston differently from other analysts; Beckman did not see Paper and Johnston together much. Beckman Dep. at 34-35.

Johnston approached Paper to express concern that he might be demoting her, as evidenced by the fact that she was being assigned less challenging reviews. *Id.* at 45-46. Johnston also asked Paper about a conversation between Paper and Barry Carlson, another employee in the specialized-underwriting division, about whether Johnston wanted to be at work

---

[7]Lobejko also testified that someone whose identity she could not recall said, after Johnston returned from maternity leave, that "since Heidi had the baby that she had lost all of her brains." Lobejko Dep. at 151-52. Because Lobejko had no idea who made this statement, the Court disregards it.

since having her baby.  *Id.* at 44-45; Paper Dep. at 55-56.  When Johnston confronted Paper

about the conversation, Paper denied having talked to Carlson about her.  Johnston Dep. at 45.

Paper told Johnston that Carlson liked to stir up trouble.  Paper Dep. at 87.  But Paper testified at

his deposition that he recalled telling Carlson sometime in the summer of 2006 that "recently

[Johnston's] work had shown deterioration and it seemed to me that it didn't appear that she had

the interest level she did before to be there."[8]  *Id.* at 25.  In any event, Johnston assured Paper that

she wanted to keep working and "had not considered not working since having a baby."

Johnston Dep. at 45; *id.* at 48-49; Paper Dep. at 87-88.

Paper told Johnston that she was not going to be demoted.  Johnston Dep. at 46; Paper

Dep. at 88.  According to Paper, he expressed some concerns about her work in May and June

2006.  Paper Dep. at 56-57, 93.  But as far as Johnston could tell, her workload returned to

normal after her May 2006 conversation with Paper.  Johnston Dep. at 46, 211.  And Paper

acknowledges that in May or June 2006, he began giving Johnston more complex work at her

request.  Paper Dep. at 74-75.

Throughout the summer of 2006, Johnston prepared roughly the same number of reviews

as other analysts.  *Id.* at 27-28 ("Quantity was not an issue.").  Paper continued to evaluate her

credit reviews, return them with comments, and discuss his comments with her.  Johnston Dep. at

---

[8]Johnston testified that sometime in May 2006, Carlson told her that Paper said that he
did not know whether Johnston wanted to be at work since having her baby.  Johnston Dep.
at 36-38.  Carlson's statement, as reported by Johnston, is inadmissible hearsay, and Carlson has
not testified firsthand about Paper's alleged statement.  The Court therefore disregards
Johnston's report of Carlson's report of Paper's statement.  But Johnston *did* testify firsthand that
she asked Paper about Carlson's statement, and Johnston's testimony about what Paper told her
is admissible.  Moreover, Paper's own testimony about what he told Carlson is, of course, also
admissible.

49-50; Paper Dep. at 79-80.  Johnston testified that during this period, "the way [Paper] treated me was similar to the [way he treated] other analysts."  Johnston Dep. at  213.  Indeed, Johnston had no concerns about how Paper treated her from May 2006 (after her conversation with him) through early September 2006.  *Id.* at 49, 168.  According to Johnston, she and Paper had "a good working relationship after that May conversation . . . ."  *Id.* at 84.

In June 2006, Paper's wife had a baby.  Paper Dep. at 30-31.  She stayed home for a month or two and then they started sending the baby to day care.  *Id.*

There is evidence that Paper was unhappy with the schedule worked by Johnston after she returned from maternity leave.  Paper told Lobejko sometime during the summer that Johnston's schedule was a problem and he did not know how long it would last.  Lobejko Dep. at 117.  And Beckman noticed that Paper would sometimes became frustrated when he was looking for Johnston and Johnston was not around.  Beckman Dep. at 46-47.

Further, according to Paper, Johnston regularly made serious substantive errors between May and September 2006.  Paper Dep. at 75-76.  Paper estimated that from fifty to sixty percent of Johnston's reviews in this period contained fundamental mistakes.  *Id.* at 94-95.  Paper thought that Johnston was making basic mistakes and that, although Johnston would correct the mistakes that were pointed out to her, she showed no interest in understanding (as opposed to just correcting) her mistakes.  *Id.* at 99-100.  According to Paper, Johnston did not ask for coaching or training during this period and, when he did provide coaching, Johnston could not explain the thinking behind her errors.  *Id.* at 79-80.  Further, Paper felt that Johnston was repeating the same type of mistakes, even after the mistakes were pointed out to her.  *Id.* at 81.

Sometime in May or June 2006, Paper approached Foust to discuss Johnston's work. *Id.* at 57; Foust Dep. at 25-26. Foust and Paper took their concerns to Barbara Borthwick, an employee in U.S. Bank's human-resources department. Borthwick Dep. at 50-51. Borthwick told Paper to provide coaching to Johnston, and Paper gave Borthwick monthly progress reports throughout the summer. *Id.* at 62-63. Borthwick instructed Paper to record specific examples of mistakes Johnston was making. *Id.* at 107. At some point in August, Foust recommended firing Johnston, but Paper wanted to give her more time. Paper Dep. at 137; Foust Dep. at 87-88. Paper, Foust, and Borthwick discussed putting Johnston on a formal, written "performance improvement plan," but decided against doing so in light of the coaching that Johnston had been receiving for several months. Borthwick Dep. at 112-14. Paper, Foust, and Borthwick decided on September 6, 2006 to fire Johnston. Paper Dep. at 136-37.

According to Johnston, she first learned that Paper had significant concerns about her work during a meeting with him on Thursday, September 7, 2006. Johnston Dep. at 50-53. Johnston discovered that Paper had been holding on to several of her reviews rather than returning them to her with comments. *Id.* at 51. At the meeting, Paper went over eight withheld reviews with Johnston and identified what were, to Paper's mind, serious errors that demonstrated Johnston's inability to do the type of work her position required. *Id.* at 51-53; Paper Dep. at 118; Jozwiak Aff. Ex. 5 at USBJ 150. According to Johnston, Paper was criticizing her for failing to do things that she had never been told to do. Johnston Dep. at 51.

Johnston was troubled during the meeting by Paper's rude and condescending tone of voice. *Id.* at 52-53. Johnston was also troubled because Paper had made a list of his comments about her reviews and was going over the list with her — something he had never done before.

*Id.* at 53; Jozwiak Aff. Ex. 5 at USBJ 150. Johnston did not ask for a copy of the list, and Paper did not volunteer to give a copy to her; instead, Paper gave Johnston the reviews back, and she made the changes that they had discussed. Johnston Dep. at 53.

Later that day, Johnston approached Paper to follow up on her concerns. *Id.* at 54. She asked Paper whether he was planning to fire her. He responded that he was very concerned with her work, had spent a lot of time going over her reviews, and was not sure that she wanted to be working at U.S. Bank. *Id.* at 54-55. Johnston testified that during this meeting, "[Paper] had mentioned that they had expected me to skyrocket when I came back from maternity leave, but that my work actually digressed." *Id.* at 82-83; *see also id.* at 236; Jozwiak Aff. Ex. 6 at 93; Paper Dep. at 109-10. Paper told Johnston that her work had deteriorated in the preceding months, since she returned from "leave." Paper Dep. at 110.

Paper informed Johnston that they would meet again on Tuesday (her next scheduled day in the office), but he also said that, while he was not telling her to look for other work, she should read between the lines. Johnston Dep. at 56-57; Paper Dep. at 108. Paper (falsely) told Johnston that no decision to fire her had been made. Paper Dep. at 108. Paper suggested that Johnston seek a job that suited her better and promised to give her a good recommendation. Johnston Dep. at 56, 58-59.

Paper sent Johnston home early on Thursday, September 7, and Johnston worked at home as usual on Friday and Monday. *Id.* at 60-61. Johnston then met with Paper, as they had discussed, on the afternoon of Tuesday, September 12. *Id.* at 65-67.

At the meeting on Tuesday, Paper told Johnston that she would inevitably be fired. *Id.* at 70. Paper reiterated that Johnston lacked credit knowledge and was not a good fit for the

department and that Paper had to spend too much time going over her work. *Id.* at 70. But Paper also said (again, falsely) that U.S. Bank had not yet decided what to do with her. *Id.* at 72-73. Johnston concluded that she would soon be moved out of the credit-initiation department, but she was not sure that she would be fired from U.S. Bank entirely. *Id.* at 76. Johnston did not believe that she was any less knowledgeable or capable than her coworkers. *Id.* at 73.

Paper asked Johnston why she did not just quit, as would most people in her shoes. *Id.* at 66-67. Johnston told Paper both that she wanted to be a credit analyst and that she did not want to quit because she would not qualify for unemployment benefits. *Id.* at 67, 71. Johnston told Paper that she would qualify for unemployment benefits only if she quit because of changed working conditions, and Paper responded that he could change her hours. *Id.* at 67-68.

According to Paper, this was a joke. Paper Dep. at 115.[9] Johnston construed the remark about her hours as a threat. *Id.* at 67-68.

Johnston also testified as follows: "[Paper] told me that I needed a more flexible job that would allow me the time to take care of my little one, one that would allow me to work from home more." *Id.* at 57; *see also id.* at 219-20 ("[Paper] had given me the reason that I lacked knowledge and that I wasn't a good fit, that I should look for work where I can work more from home so I can take care of my little one."). Johnston was not sure whether Paper said this on Tuesday, September 12 or during the earlier meeting on Thursday, September 7. *Id.* at 57. Paper also told Johnston during one of those two meetings that he had spoken with Foust about recommending Johnston for a job as a credit analyst at a branch bank. *Id.* at 61-62; Paper Dep.

---

[9]At Paper's deposition, Paper and Johnston's counsel had the following exchange:

Q:    Do you recall indicating to [Johnston] that if she did not quit . . . you could always change her hours or the bank could?

A:    . . . [S]he was kind of joking about her hours . . . and I said as a joke, well, I mean, hours can always change, it's not why — we're not — you're not gonna quit because of that, and she just went on again saying I'm not gonna quit, I'm not gonna quit, and I don't want to be fired, so it was more of a casual — it wasn't me saying we're just gonna change your hours and put you on the spot. I would never do that.

Q:    I guess I don't quite follow your [*sic*] if it was a joke.

A:    She was asking about her hours and she said, well, something about her hours . . . and I said, well, if we really wanted to we could just change the hours, but let's be real, we're not gonna do that.

Q:    What do you mean, change the hours? Like reduce them, right?

A:    Exactly — no, I could always say, no, you can't work your flex time, you have to work from eight to five, and that's not I said, that's not the issue at hand here.

Paper Dep. at 115-16.

at 114.[10]  Paper told Johnston that working at a small branch, in a slower-paced environment, was

a good way to get training, and Paper told Johnston that he had started his own career at a branch

bank.  Johnston Dep. at 61-62.  Paper also told Johnston that he had worked with women with

flexible schedules who worked in branch banks.  *Id.* at 62.

Johnston did not complain to U.S. Bank's human-resources department about these two

meetings with Paper.  *Id.* at 76-77.  Johnston felt that it would be futile because Paper and Foust

had made up their minds to fire her.  *Id.* at 77.  When asked about the basis for Paper and Foust's

decision to fire her, Johnston said:  "I believe that it was due to me having a child, and them

allowing to give me the flexible schedule that I had.  I think [Paper] felt it didn't make him look

good."  *Id.* at 77.

During her first meeting with Paper, on September 7, Johnston had told Paper that some

of the mistakes he was pointing out reflected expectations that had never been communicated to

her or her fellow analysts.  *Id.* at 41-42, 190-204; Paper Dep. at 116-18.  Paper then held a

meeting with Johnston, Beckman, and Johnson on Thursday, September 14, at which he went

over some of the issues that he had identified as problems in his earlier meeting with Johnston.

Paper Dep. at 116-18.

The next week, on Tuesday, September 19 at about 8:00 a.m., Johnston was called into a

conference room to meet with Paper and Borthwick.  Johnston Dep. at 218-19, 252-53.  Paper

told Johnston that she was fired.  *Id.* at 219.  During the meeting, Paper said that, since May

2006, he had trained and trained Johnston, but she just was not catching on.  *Id.* at 252-53.

_____

[10]According to Foust, Paper mentioned trying to find Johnston work in a branch bank, but
Foust did not like the idea.  Foust Dep. at 124-25.

Johnston's co-workers were surprised to learn that she had been fired. Beckman was unaware of any problems with Johnston's work. Beckman Dep. at 77-78. Fennacy, who worked in portfolio management, was "shocked" that Johnston had been fired. Fennacy Dep. at 9. And Lobejko was reprimanded by Borthwick and Lobejko's manager, Richard Craine, for sending an email to Johnston saying that a fellow employee looked at one of Johnston's reviews and "can't understand why you['re] not here. He's not the only one." Jozwiak Aff. Ex. 11 at USBJ 222; Lobejko Dep. at 216; Borthwick Dep. at 120.

After leaving U.S. Bank, Johnston went to beauty school to train as an esthetician. Johnston Dep. at 277-282. She worked only briefly as an esthetician before taking a position as a credit analyst with Anchor Bank in May 2007. *Id.* at 282-83. Johnston brought this action in June 2007, and U.S. Bank later removed it to this Court.

## II. DISCUSSION

### A. *Standard of Review*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006). In considering a motion for summary judgment, a court "must view the evidence and the inferences

that may be reasonably drawn from the evidence in the light most favorable to the non-moving party." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

## B. Sex-Plus Discrimination

The MHRA (like Title VII) prohibits employers from firing employees, or otherwise discriminating against them, on account of their sex. Minn. Stat. § 363A.08 subd. 2. Because the MHRA and Title VII provide similar protections, "sex discrimination claims under Title VII and the MHRA may be analyzed simultaneously." *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123, 1127 (8th Cir. 2008). Therefore, although Johnston has sued for discrimination only under the MHRA, the Court will rely on both Title VII cases and MHRA cases.

The MHRA (like Title VII) has been construed to prohibit what is known as "sex-plus discrimination" — that is, an adverse action taken by an employer against an employee both because of the employee's sex and because of other factors. *See Pullar v. Independent School District No. 701*, 582 N.W.2d 273, 276-77 (Minn. Ct. App. 1998); *see also Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971) (per curiam); *King v. Trans World Airlines, Inc.*, 738 F.2d 255, 259 (8th Cir. 1984) ("[A]n employer cannot have two interview policies for job applicants with poor work records, poor attendance records, small children or some other characteristic — one for men and one for women."). Sex-plus discrimination must, however, be discrimination *based on sex*. *Pullar*, 582 N.W.2d at 277 ("To be actionable, however, 'sex-plus' discrimination claims must be premised on gender."); *Coleman v. B-G Maint. Mgmt. of Colo., Inc.,* 108 F.3d 1199, 1203 (10th Cir. 1997). Thus, an employer commits sex-plus discrimination if it treats men with children better than women with children — and this is true even if the employer does not treat women *without* children any worse than men without children (or, for

-17-

that matter, any worse than men with children). But an employer who treats *everyone* with children poorly does not commit sex-plus discrimination. Such an employer is not treating women worse than men; instead, the employer is treating men and women with children worse than men and women without children.

U.S. Bank contends that Johnston cannot prove sex-plus discrimination because "she is unable to make a showing of a sub-class of men with children who reported to Paper while she was employed, much less preferential treatment to the sub-class." Def. Mem. Supp. Mot. S.J. ("Def. SJ Mem.") at 19 [Docket No. 26]. The Court agrees with Johnston that U.S. Bank misstates the law. *See* Pl. Mem. Opp. Def. Mot. S.J. ("Pl. SJ Opp.") at 32-33 [Docket No. 33]. Showing that Paper treated similarly situated men better than Johnston would be *one way* for Johnston to prove sex-plus discrimination, but it would not be the *only* way. Suppose, for example, that Paper had told Johnston when he fired her: "You are the best credit analyst we have ever had, but although I don't mind it when men with children work, I really don't think that women with children should be working, so I've decided to fire you." Would U.S. Bank seriously contend that no reasonable jury could find that Paper fired Johnston because of her sex?[11]

---

[11]It is true, as U.S. Bank points out, that the Minnesota Court of Appeals in *Pullar* said: "'Sex-plus' plaintiffs can never be successful unless there is a corresponding sub-class of members of the opposite gender." 582 N.W.2d at 277. But *Pullar* did not really mean that.

*Pullar* cited for this proposition a Tenth Circuit case, *Coleman v. B-G Maintenance Management of Colorado, Inc.*, which said that "gender-plus plaintiffs can never be successful if there is no corresponding subclass of members of the opposite gender." 108 F.3d at 1204. But in *Coleman*, the plaintiff sought to prove that she was discriminated against based on her sex plus her marital relationship with a particular coworker. *Id. Coleman* held that because no one else could possibly be married to that coworker, and in light of the jury instructions, the plaintiff's

(continued...)

-18-

As a plaintiff alleging sex-plus discrimination, Johnston must, of course, establish that she was discriminated against based on her sex — which is, analytically, equivalent to establishing that a similarly situated man would not have been discriminated against if such a man existed. But it does not follow that Johnston must be able to prove that a particular similarly situated man was in fact treated better than she. Rather, whether such a showing must be made depends on the strength of Johnston's proof of sex discrimination.

As this Court explained in *Darke v. Lurie Besikof Lapidus & Co.*, 550 F. Supp. 2d 1032, 1040 (D. Minn. 2008), there are basically two ways to prove sex discrimination: (1) the direct method and (2) the indirect method — that is, the method described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See, e.g., Rogers v. City of Chicago*, 320 F.3d 748, 753-54 (7th Cir. 2003) (discussing direct and indirect methods of proof). When a plaintiff has strong (often called "direct") evidence of discrimination — such as an admission by a defendant that it discriminated against her — she simply submits her proof without relying on the three-part *McDonnell Douglas* framework. *Darke*, 550 F. Supp. 2d at 1040. Conversely, when a plaintiff has weaker (also called "indirect") evidence of discrimination, her claim is examined under *McDonnell Douglas*. *Id.*

---

[11](...continued)
claim was in effect one for discrimination based on her marital status *alone*, not on her sex plus her marital status. *Id.* ("The district court failed to instruct that [the plaintiff] must show that similarly situated men were treated differently; thus the instructions allowed the jury to award a verdict in [the plaintiff's] favor if marital status alone were the reason for her termination. Title VII . . . does not protect marital status alone."). *Coleman* therefore does not establish that, in every case, no matter how strong the evidence of discriminatory intent, a woman alleging sex-plus discrimination cannot prevail without evidence about similarly situated men. And neither does *Pullar*, which simply parrots *Coleman*.

At the first of the three steps in the *McDonnell Douglas* framework, a plaintiff must establish a prima facie case of discrimination, which entails showing: (1) that she belongs to a protected class; (2) that she was qualified for the position or (depending on the type of case) was meeting her employer's legitimate expectations; (3) that she suffered an adverse employment action; and (4) that the adverse employment action took place under circumstances giving rise to an inference of discrimination. *Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1055 (8th Cir. 2007); *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 857 (8th Cir. 2004). The requisite inference of discrimination arises, at the prima facie stage, if similarly situated employees outside of the protected class did not suffer the challenged adverse action. *Wheeler*, 360 F.3d at 857.

Accordingly, a plaintiff seeking to prove sex-plus discrimination using the indirect, *McDonnell Douglas* framework — instead of seeking to prove sex-plus discrimination using the direct method of proof — must generally establish the existence of similarly situated employees outside the protected class (so-called "comparators") who were treated better than the plaintiff. *See Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006)*; Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 851-52 (8th Cir. 2005).[12] Thus, in this case, if Johnston relies on the indirect

_____

[12]The Second Circuit said in *Holtz v. Rockefeller & Co.* that evidence of disparate treatment — that is, evidence of comparators who were treated differently from the plaintiff — is not always necessary to establish a prima facie case using the *McDonnell Douglas* framework. 258 F.3d 62, 77 (2d Cir. 2001). Johnston relies on a post-*Holtz* Second Circuit case to assert that she need not establish the existence of a comparator. Pl. SJ Opp. at 32 (discussing *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107 (2d Cir. 2004)).

But *Holtz* said that disparate-treatment evidence was unnecessary under *McDonnell Douglas* if the plaintiff had *direct evidence* of discrimination. 258 F.3d at 77 ("A plaintiff may rely on direct evidence of what the defendant did and said in satisfying her initial burden under *McDonnell Douglas*.") (internal quotation marks omitted). In the Eighth Circuit, a plaintiff with such direct evidence can rely on the direct method of proof; she need not rely on the indirect (i.e.,
(continued...)

method of proof, U.S. Bank is correct that she must establish that men with children were not discriminated against while she, as a woman with a child, was.[13]

The Court agrees with U.S. Bank that Johnston cannot make out a prima facie case of sex-plus discrimination under *McDonnell Douglas* because there is no evidence in the record of a similarly situated male employee who was treated more favorably than Johnston. During the time period beginning just before Johnston was fired and ending just after her firing, a total of three male employees worked as credit analysts under Paper in the credit-initiation department: Drew Beckman, Tony Wolfe, and Steve Van Gheem. One male employee, Bob Peterson,

_____

[12](...continued)
*McDonnell Douglas*) method of proof. The Court believes that the Eighth Circuit's approach and the Second Circuit's approach are consistent and differ only with respect to how they characterize the use of direct evidence, not in what they require of plaintiffs bringing discrimination claims.

[13]Because Johnston must establish that she was discriminated against because she was a woman with a child — instead of a man with a child — she cannot create an inference of discrimination merely by showing that women without children were treated differently than she. Disparate treatment by an employer of women with children and women without children would show, in the absence of other evidence, only that the employer discriminated against people with children. But the MHRA does not forbid discriminating against people with children; it only forbids discrimination based on "race, color, creed, religion, national origin, sex, marital status, status with regard to public assistance, membership or activity in a local commission, disability, sexual orientation, or age . . . ." Minn. Stat. § 363A.08 subd. 2.

Johnston effectively concedes this point, as she does not offer any evidence with respect to possible female comparators. Johnston does assert that "Lobejko testified that shortly after Paper became Fennacy's supervisor, he tried to convince Fennacy that she did not need to take the time to provide caregiving to her children." Pl. SJ Opp. at 32. But this assertion, which is not supported by any record citation, appears to be inaccurate. According to Lobejko, Paper complained about Fennacy's schedule in 2005. Lobejko Dep. at 102-04. But Fennacy only worked for Paper in late 2006 and early 2007. Fennacy Dep. at 12. And while Lobejko testified that Paper complained *to her* about Fennacy's schedule, neither Lobejko nor Fennacy testified that Paper complained *to Fennacy* about Fennacy's schedule. Further, Fennacy herself testified that she did not think that Paper discriminated against her because of her sex. Fennacy Dep. at 18.

worked under Paper in the portfolio-management department after Paper was put in charge of that department in November 2006. We know next to nothing about Wolfe, Van Gheem, and Peterson, and Johnston does not even attempt to argue that they are comparators. Pl. SJ Opp. at 32-33.

Instead, Johnston puts forth two possible comparators: Paper and Beckman. *Id.* Paper is obviously not a proper comparator. Johnston worked for Paper; Paper *was* Paper. The fact that a manager treats himself better than his employees does not imply that the manager discriminates against whatever groups the employees belong to.

Beckman could conceivably be a proper comparator, but the evidence is insufficient to establish this. Johnston asserts, without any record citations, the following:

> Drew Beckman took flex time after his wife had a child. Yet Lobejko did not observe that he suffered from any negative consequences. In fact, the contrary was true. Paper provided more one-on-one training and feedback. Beckman also continued his employment after he was allowed to take flex time on account of having a newborn.

Pl. SJ Opp. at 32-33. This passage is inaccurate and misleading. It implicitly asserts that Lobejko testified that after Beckman took flex time, Beckman did not suffer any negative consequences and in fact received extra training from Paper. But Lobejko testified that she was unaware of any male credit analyst — which would include Beckman — taking any flex time. Lobejko Dep. at 126 ("Q: Are you aware of any male credit analyst who was working for Mr. Paper who had a bank approved flexible work schedule? A: No."). Lobejko did testify that Beckman received more one-on-one training than Johnston, but she never testified about the "consequences" of Beckman's having taken flex time (nor could she, since as far as she knew, Beckman never took flex time).

-22-

Further, the record is virtually devoid of any evidence about what happened after Beckman's child was born (or, for that matter, even *when* the child was born). At his deposition, Beckman himself was asked nothing, and said nothing, about having a child. The only evidence the Court has found related to Beckman's child is in the errata sheet to Paper's deposition. At his deposition, in response to a question about requests for flex time, Paper testified that he denied Beckman's request to work from 7:00 a.m. to 4:00 p.m. Paper Dep. at 144. In the errata sheet to his deposition, Paper said:

> The question as phrased [at the deposition] was confusing in terms of "flex time off." Drew Beckman was not given flex time off. He requested flex time, and that request was denied. At a different time, he requested time off after the birth of his child, and that request was granted.

Jozwiak Aff. Ex. 25.

The evidence thus establishes that at some point, Beckman's wife had a child, and Beckman got some time off (though not a flexible schedule). This evidence fails to establish that Beckman was sufficiently similarly situated to Johnston to serve as a comparator for purposes of the *McDonnell Douglas* analysis. *See Rodgers*, 417 F.3d at 852 (adopting a "low-threshold standard" for identifying comparators). After she had her baby, Johnston worked from home two days a week and worked an early shift at the office on the other three days. As far as the record shows, Beckman took some time off after his child was born and returned to work on a normal schedule. Given the difference in Johnston's and Beckman's schedules, Beckman is not a proper comparator.

In the absence of any comparators, Johnston cannot make out a prima facie case of discrimination and thus cannot get past the first step of the *McDonnell Douglas* framework. The

only question, then, is whether the "direct" evidence of discrimination in this case is so strong that she does not *need* the *McDonnell Douglas* framework. Although the question is close — so close, in fact, that the Court has gone back and forth about whether it should grant summary judgment to U.S. Bank — the Court finds that Johnston's "direct" evidence is sufficient to raise a genuine issue of material fact as to whether she was discriminated against based on her sex plus her child-care obligations.

Johnston's strongest evidence of discrimination is Paper's statement, either on September 7 or September 12, that Johnston "needed a more flexible job that would allow [her] the time to take care of [her] little one, one that would allow [her] to work from home more." Johnston Dep. at 57; *see also* Johnston Dep. at 219-20. On the one hand, Johnston was working a flexible schedule that she had herself requested to help her cut down on day-care costs, and Paper's statement could simply be an acknowledgment of this fact. On the other hand, Paper's statement could be taken to reflect the discriminatory, stereotypical belief that women should stay home with their children. *See Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 120 (2d Cir. 2004) (noting that "it takes no special training to discern stereotyping in the view that a woman cannot 'be a good mother' and have a job that requires long hours"). Indeed, a nearly identical remark was held to be "direct evidence" of discrimination by the Seventh Circuit in *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999). *Sheehan* held, in a Pregnancy Discrimination Act case, that a supervisor's remark to the plaintiff and her co-workers at the time of her firing that she would be "happier at home with her children" provided "direct evidence of discrimination . . . ." *Id.*; *see also id. at* 1044-45 ("A reasonable jury might conclude that a supervisor's statement to a woman known to be pregnant that she was being fired so that

-24-

she could 'spend more time at home with her children' reflected unlawful motivations because it invoked widely understood stereotypes the meaning of which is hard to mistake.").

U.S. Bank asks the Court to discount Paper's statement for a couple of reasons. First, U.S. Bank contends that the statement was not made "during the process of determining the future of Johnston's employment." Def. SJ Mem. at 23. That is simply not true. Paper, Foust, and Borthwick decided to fire Johnston on September 6, and Paper allegedly made the comment during subsequent meetings with Johnston in which Paper (according to Johnston, whose testimony must be believed at this stage) tried to persuade Johnston to quit by implying that she would be fired.

Second, U.S. Bank contended at oral argument that Paper made his statement in the course of a conversation in which Johnston explained that she would need a flexible schedule if she took a new job. But that was Paper's testimony, not Johnston's. At her deposition, shortly after she testified about the "little one" statement, Johnston was asked: "[D]idn't you tell [Paper] that you needed a job that would allow you the same flexibility that you had in your position at U.S. Bank?" Johnston replied: "No, I didn't tell him that. . . . I never said that." Johnston Dep. at 58.[14]

The remaining circumstantial evidence supports Johnston. Taken in the light most favorable to Johnston, the basic facts are as follows:

_____

[14]Johnston's contemporaneous notes about her September 12, 2006 conversation with Paper include the statement: "I said the benefits I have here would probably not be given to me elsewhere in the bank. I need to work from home/work these hours for my family, economically and to keep the baby out of daycare 10 hours a day." Jozwiak Aff. Ex. 6 at 94. This exhibit appears to contradict Johnston's deposition testimony about her conversation with Paper — and U.S. Bank will undoubtedly use this exhibit at trial to impeach Johnston's credibility — but, at this point, the Court must treat Johnston's deposition testimony as true.

Johnston's performance in the credit-initiation department was satisfactory for about nine months, from April 2005 through early January 2006. When she returned from maternity leave in March 2006, Paper gave her simpler work than she should have received. After she confronted Paper about it, he admitted doubting her commitment to the job, but he agreed to give her more complex credit applications to review. For the rest of the summer, as far as Johnston or any of her coworkers knew, her work was fine. Paper returned reviews to her for correction, but no more than would be expected. Paper gave Drew Beckman somewhat more coaching than Johnston got, but Johnston did not think that anything was amiss. Then, suddenly, Paper told Johnston on September 7 that her work was seriously deficient and suggested that she quit before she got fired. (Unbeknownst to Johnston, Paper, Foust, and Borthwick had decided to fire her the day before.) Many of the deficiencies that Paper pointed out were things he had never criticized before and that she could not have known were errors. Indeed, Paper held a meeting the next week to explain certain of the items for which he criticized Johnston to the rest of the analysts in the credit-initiation department. But only Johnston was fired. Most importantly, in trying to persuade Johnston to quit, Paper said that she needed a job that would allow her to spend more time with her "little one."

Under the circumstances, a jury must decide whether U.S. Bank discriminated against Johnston based on her sex and her child-care obligations. Johnston's case is admittedly weak, but a plaintiff is entitled to take a weak case to trial, as long as the case is not so weak that a reasonable jury could not find in the plaintiff's favor. Although the question is close, the Court concludes that a reasonable jury could find in Johnston's favor, and thus U.S. Bank's motion for summary judgment on Johnston's sex-plus discrimination claim is denied.

# ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT defendant U.S. Bank National Association's motion for summary judgment [Docket No. 24] is GRANTED IN PART and DENIED IN PART as follows:

1.  Count II of Johnston's amended complaint, alleging retaliation in violation of the Family and Medical Leave Act, is DISMISSED WITH PREJUDICE AND ON THE MERITS.

2.  Johnston's claim for pregnancy discrimination in violation of the Minnesota Human Rights Act as alleged in Count I of Johnston's amended complaint is DISMISSED WITH PREJUDICE AND ON THE MERITS.

3.  Johnston's claim for retaliation in violation of the Minnesota Human Rights Act as alleged in Count I of Johnston's amended complaint is DISMISSED WITH PREJUDICE AND ON THE MERITS.

4.  Defendant U.S. Bank National Association's motion for summary judgment [Docket No. 24] is DENIED with respect to Johnston's claim for sex-plus discrimination in violation of the Minnesota Human Rights Act as alleged in Count I of Johnston's amended complaint.

Dated:  September 2 , 2009          s/Patrick J. Schiltz_____
                                    Patrick J. Schiltz
                                    United States District Judge